Peelle, J.,
delivered the opinion of the court:
This action is to recover for certain work performed b}^ the claimants for the United States in the extension of the Washington Aqueduct and for money retained for like work under their contract, dated October 29, 1883, with the defendants, through Maj. G. J. Lydecker, Corps of Engineers, U. S. Army, approved by the Chief of Engineers November 19, 1883, and sundry supplemental agreements hereinafter referred to, all being made part of the petition in this case.
Under the original contract the claimants obligated themselves to furnish the materials, to do the work, and to construct a tunnel about”twenty thousand eight hundred and twenty-six (20,826) feet in length, eleven (11) feet wide, and seven and one-half (7i) feet high, from the distributing reservoir above Georgetown to the proposed new reservoir east of Howard Universit3T, in consideration of which the United States agreed to payr therefor (on monthty estimates approved by the engineer, less 10 per cent to be retained until the final completion and acceptance of the work) as follows:
“For excavation in tunnel, eight (8) dollars per cubic yard.
“For earth excavation in shafts, six (6) dollars per cubic yard.
“ For rock excavation in shafts, ten (10) dollars per cubic juird.
“For brick masonry in tunnel, fourteen (14) dollars per cubic j-ard.
“For concrete masomy in tunnel, five (5) dollars per cubic 3rard.
“For dry stone packing in tunnel, two (2) dollars and fift3r (50) cents per cubic yard.
“For brick masonry in shafts, eighteen (18) dollars per cubic 3rard.
“For concrete masonry in shafts, five (5) dollars per cubic 3Tard.
“For dry stone packing in shafts, two (2) dollars and fifty^ (50) cents per cubic 3rard.
“For air shafts, complete, fifteen (15) dollars per lineal foot.”
*306 The work was to be commenced on or before the 20th day of November, 1883, and to be completed on or before the 30th day of June, 1885.
The contract, among other things, provided that—
“All materials furnished and work done under this contract shall, before being accepted, be subject to a rigid inspection by an inspector appointed on the part of the Government, and such as does not conform to the specifications set forth in this contract shall be rejected. The decision of the engineer officer in charge 'as to quality and quantity shall be final.”
The specifications made part of the contract provided fox-dry stone packing for filling large void spaces wherever the same could be advantageously done to save concrete masonry.
II nder the terms of that contract the claimants began work in December, 1883, and continued until the 30th day of January, 1886, when work thereunder was suspended by the United States.
Thereafter, on October 18,1886, the same parties executed a supplemental agreement, whereby it was, among other things, in substance provided that, as the Congress had by the general deficiency act of August 4,1886, in making appropriations for the completion of the tunnel, instructed the Secretary of War “to submit to the board of engineers for fortifications and for river and harbor improvements whether any changes are demanded for reasons of safety or economy in the method of lining said tunnel heretofore adopted and pursued; ” and as said board had, as. recited in said supplemental agreement, made a report August 24, 1886, requiring ‘ ‘ rubble laid in cement mortar or with fine concrete packed solidly around larger stone,” in lieu of the dry stone packing provided for m the original contract, thereb}^ necessitating a modification in the original project, increasing the cost of the work, it was for that reason agreed:
“That the said party of the second part, iri consideration of the extension of the original contract to include the work of lining that may be done under the appropriation made by the act approved August 4, 1886, hereinbefore referred to, and of payment to be made as hereinafter provided, shall furnish all material for, and place rubble laid in cement mortar wherever required in the tunnel, all as directed by and to the entire satisfaction of the party of the first part.
*307 “ In consideration of the material being- furnished and the rubble laid as provided for in the foregoing- paragraph, the said party of the first part shall pay to the said party of the second part at the rate of four (4) dollars and seventy-five (75) cents per cubic yard; all payments being subject to the conditions named in the original contract.”
It was therein further provided that the original contract should “ apply to the work and materials provided for by the supplemental articles of agreement so far as the provisions are deemed applicable by the party of the first part.”
The claimants resumed work August 30, 1886, and continued under the original and supplemental agreement aforesaid until September 30,1887, when the work was again suspended by the United States.
Thereafter, December 5, 1887, the same parties entered into a second supplemental agreement wherein, among other things, it was in substance provided that in furtherance of and supplemental^ to the aforesaid original and supplemental contracts, and by reason of the exhaustion of the appropriations theretofore made for the work, it became necessary to suspend active operations, and for that reason it was deemed for the mutual interest of both parties:
“First. That in consideration of the work already done to the satisfaction of the party of the first part, and of the further consideration that the entire work in contemplation can not be completed under any contract in which the parties of the second part are now concerned, the party, of the first part shall surrender and pay to the parties of the second part the sum of seventy-eight thousand two hundred and seventy-nine dollars and fifty-one cents ($78,279.51), such sum being eighty-five (85) per cent of the percentage heretofore retained and •withheld from the parties of the second part as a guarantee for the faithful performance of their work as provided in the original articles of agreement.”
Further provision was made therein for delay in the removal of the machinery, rubbish, and refuse material until after an appropriation should be made for the resumption of operations and for keeping the pumping machinery in proper order for use when needed, the Government to pay the expenses of operating the same in the meantime and to compensate the contractors for the use thereof.
*308 It was further provided tnat nothing therein contained should “be construed to release from or add to any obligation, liability, right, or duty devolving on either partjr under the operations of the two several articles of agreement to which the foregoing are supplemental.”
Thus active operations in the construction of the tunnel were suspended until May 8, 1888, when the same parties entered into a third supplemental agreement, whereby, among other things, it was, in substance, provided that an appropriation of $355,000 had been made by the Congress for the completion of the Aqueduct tunnel, and • giving to the Secretary of War authority to complete the work under the foregoing-contracts, or to relet the work, in his discretion, at prices not exceeding those fixed, as aforesaid. And after the Secretary had determined that it was promotive of the interests of the United States to complete the work under tlie foregoing contracts, it was agreed between the parties that the claimants should continue the work to completion so far as the appropriation therefor should suffice, and that the work should be completed by November 1, 1888, as provided in the act of appropriation aforesaid. And in further specification of the work said supplemental agreement provides:
“It is also understood that the tunnel lining to be done under these supplemental articles of agreement will include three classes, viz: 1st. Brick arch, side wall, and invert — such as has heretofore been applied to the work — substantially as shown on tracing hereto attached, in section marked ‘A.’ 5>d. Nubble masonry side walls, and two-ring brick arch, substantially as shown on tracing hereto attached, in section marked ‘B.’ 3d. Rubble masonry side walls, and three-ring brick arch, substantially as shown on tracing hereto attached, in section marked ‘C.’ The backing in all cases to be of rubble masonry, such as called for in previous articles of agreement. The rubble masonry side walls contemplated herein will not be-less than eighteen (18) inches in thickness, and constructed throughout in accordance with the following:
“ Specifications for nJMe side walls. — The rubble side walls provided for in these articles will be constructed of clean, sound, and durable stone, selected for the purpose; the;v must be carefully laid, in cement mortar, in such manner as to fit approximately, being roughly shaped with the hammer, if necessary to make such fit. Mortar must be freely used, so as to solidly fill all spaces between stones, and to bulge out *309 beyond the face joints when the stone is placed in position, the object being to make the wall as nearly water-tight as possible. The face of the wall must be laid true to the linos given and so that projections shall not extend more than one and one-half (1£) inches beyond the designated plane of the face; the facing joints shall bo neatly outlined and finished, and the top of the wall shall be truly leveled to the spring of the brick arch.
“It is further agreed that payment for the aforesaid work of lining shall be as follows: For full lining of 1st class, forty dollars (§10) per linear foot of tunnel so lined; for lining of 2d class, twenty-four dollars and fifty cents (§21.50) per linear foot of tunnel so lined; for lining of 3d class, twenty-eight dollars and fifty cents (§28.50) per linear foot of tunnel so lined. The prices aforesaid. being no greater than those allowed under the contract under which work has heretofore been done on the tunnel, and such as will insure the completion of the work within the limits of the-sum appropriated therefor. It is expressly understood that the prices paid, as above, include compensation for all work and material necessaiy for the solid lining of the tunnel in the several classes, as well as the work of enlarging the tunnel from the normal cross section to that required for placing the designated lining.
“It is further stipulated and agreed .that all brickwork in the lining of the tunnel shall be done by expert brick masons, and that the stonework of said linin g shall be done by expert stone masons.
“ In consideration of the first proviso of the urgent deficiency act hereinbefore named, it is also understood and agreed that if work on the tunnel is not completed by the 1st day of November, 1888, the parties of the second part may, at their option, continue to prosecute the work within the limits provided for by the appropriation of §355,000 made by Congress in the act herein named, but no payment for such work done or material furnished after said date shall be made until Congress shall have extended the time for the completion of the work, unless the Secretary of War shall then determine that the time for completion under these articles of agreement may be extended, and’shall thereupon expressly authorize payment to be made in the usual manner for the work done during the period of extension.”
It was further provided that “nothing therein contained shall be construed to release or add to any obligation, liability, right, or duty involved in the original contract of October 29, 1883, or any articles of agreement supplemental thereto, so far as concerns the parties in interest, except as specifically provided in these final supplemental articles,”-when approved *310 bjr the Chief of Engineers, U. S. Army, which was done Ma}' 9, 1888.
Under that supplemental contract the claimants resumed work and continued in the prosecution thereof until suspended bjT order of the Secretary of War, October 31, 1888, and no work was done thereon until the year 1898, when the Government resumed work on the tunnel and the defective work and finally completed the same in the year 1902.
The claimants brought their action in this court April 13, 1889, claiming that the United States were indebted to them for the work performed under said contracts in the sum of $223,303.02, with interest, less the sum of $15,892.67, which they estimated as the probable cost of repairing the defective work. Their petition was subsequently amended, changing the.amount of their demand to $298,162.61.
No claim is made by the claimants for damages in consequence of the suspensions of the work, but their demand is for the retained percentages and other money withhold as set forth in findings x, xi, and xn, amounting to $42,901.17, and for the further sum of $138,315.68 for work and labor actually performed under the supplemental contract of May 8, 1888, and for further and additional work and labor performed under the original contract as set forth in the findings, the pajmient of all of which was withheld from the claimants until the extent of the damages caused by the defective work in packing behind the tunnel, as set forth in finding vi, had been ascertained by the United States and the work had been finall}” completed and accepted.
This defective work was repaired and completed at the necessary and economical cost to the United States of the sum of $50,480.97 — a much less sum than had been estimated by the engineer officers of the Gqvernment — -and. for the inonejr so expended the defendants have interposed their counterclaim, and upon that the principal controversy in the case arises'.
By reference to finding vi it will be observed that the work in the lining of the tunnel was, without final inspection, accepted by the engineer officer in charge, in ignorance of the defective character of the work; that the claimants had sublet the work as therein set forth, and did not, in fact, know that their subcontractors had violated their contract with them.
*311 The work not having been done according to claimants’ contract with the defendants, thej", and not their subcontractors, must respond in damages for'whatever loss the defendants have sustained in the completion of the defective work, unless the acceptance of the work, in the manner indicated, b}r the engineer officer operates to estop the defendants therefrom.
The specifications made part of the contract, among other .things, provide that—
“All work and workmanship must be of the best of its kind, satisfactory in every respect to the United States engineer.” * *
Another provision of the contract is that—
“The decision of the engineer officer in charge as to quality and quantity shall be final.”
Upon these provisions of the 'contract the claimants contend that, though the engineer officer did not make final inspection of the work, his acceptance thereof operates in law to bind the United States.
If there had been final inspection of the work and the engineer officer in charge had decided and certified that the work had been done as to quality and quantity according to the requirements of the contract, it might be held that this bound the defendants. But here those facts are not shown. The “acceptance” of the work was not the final decision contemplated by the contract; and if the contractor, upon the faith of it, paid his subcontractors, he paid them at his own risk. Furthermore, had the claimants, through their subcontractors, performed the work according to their contract with the defendants, no injury could have resulted to the claimants bjr reason of the omission or neglect of duty of the Government officer to make proper inspection before accepting the work. Therefore, upon the assumption that both the claimants and the defendants were in fact equally ignorant of the defective work when it was so accepted, they who employed the subcontractors, and not the defendants, should suffer.
It is no answer to say that upon the faith of the acceptance of the work the claimants settled in full with their subcontractors, when in law the default and negligence of the subcontractors were, as between the claimants and the defendants, the default and negligence of the claimants, and there having *312 been no final inspection of the work, the claimants can not relieve themselves from responsibility, because the defect-tye work was ■ in fact caused by their subcontractors, with whom the Government had no privity. If they had exercised reasonable diligence in that respect they would have possessed themselves of the facts in relation to the defective work and would thereby have been enabled to correct the same as the work progressed. Good faith on their part required this.
It follows that the claimants are not in a position to take advantage of the neglect of duty on the part of the engineer officer to inspect the work, the character of which the claimants were bound to know.
The contract provides in substance that if the contractors shall delay or fail to commence work, or shall, “in the judgment of the engineer in charge, fail to prosecute faithfully and diligently the work in accordance with the specifications and requirements” of their contract, then—
“In either case, the party of the first part, or his successors legalty appointed, shall have power, with the sanction of the Chief of Engineers, to annul this contract by giving notice in writing to that effect, and upon the giving of such notice, all money or reserved percentage due or to become due * * * by reason of the contract shall be and become forfeited to the United States.”
■ The contracts, however, were not formally annulled, but, as set forth in finding xxvxi, the claimants were on October 31,1888, pursuant to instructions from the Secretary of War, informed that the work had been suspended, “except so far as relates to keeping the tunnel free from water and the removal of muck and the protection and preservation of the work already done on the same;” and to that end the claimants were notified to confine their operations within the limits indicated, thus showing that although the time for the completion of the contract had expired and the claimants were in default, yet the defendants elected to suspend the work (except as indicated) instead of formally annulling the contract.
The suspension of the work, however, proved as effectual, so far as the further prosecution of the work by the claimants was concerned, as though their contracts had been formally annulled.
*313 The defendants, however, contend that whether the work was suspended or the contracts annulled, their rights are the same in respect to their counterclaim for the actual damages sustained.
They do not contend'that all the money withheld or otherwise due the claimants under the contracts has become forfeited to the United States by reason of the claimants’ failure t) complete the work within the time spécified, but their contention is that the reasonable damag'es sustained by them for the necessary work and labor performed and for the materials furnished in the completion” of the defective work, are proper charges against the claimants, and to that extent should be recouped against any sum found due for the work performed by the claimants under their contracts.
In this view we concur and hold that the counterclaim is well pleaded.
■ Another item of contention arises on the facts set forth in finding xv, because of the reduction made in the amount there found due.
Under the supplemental contract of May 8,1888, the defendants performed certain work in enlarging the original rectangular cross sections, which had been driven under the original contract to a length of 5,423.2 linear feet in order to obtain the necessary additional space to put in rubble-masonry. side walls and brick arch required by the terms of the supplemental contract aforesaid. That work at the contract rate, amounted to §59,454.40, but, as under the terms of the contract the work was to be completed by November 1,1888, and was not done, the Secretary of War stopped the work before the cross sections had been lined as required by the contract.
The defendants, to conform the work to the contract requirements, made further enlargement of the tunnel and put in the rubble-masonry lining, the reasonable cost of which.was §12,961.44. At the same time, in order to do that work, the defendants were compelled to clean out and remove a thousand yards of muck at the reasonable cost of $900, or, in all, $13,861.44, which latter amount the court holds is a proper-charge against the claimants, and, deducting that sum from the $59,454.40, leaves due the claimants on this finding the sum of $45,592.96'.
*314 On the facts set forth in finding xvi the defendants contend that the measurements of the engineer in charge should control, because the original contract under which the work therein set forth was done provides that “the decision of the engineer officer in charge as to the quality and quantity shall be final.”
In that finding it will be noted that the claimants, in order to make space to enable them to.put in the lining and brick masonry required by the contract, necessarily excavated 7,123.7 linear feet, being a clearance along the perimeter of the arch of from 4 to 6 inches, the average cost of which, at the contract rates set forth in the findings, was $33,743.72.
This work was done under the original contract, and it -was necessaiy to be done in order to enable the contractors to perform their contract; and being a partof the work required to be .done under the contract, the same should have been measured by the engineer in charge of the work. He, however, measured only to the outer perimeter of the brickwork, making no allowance for any space beyond that within which to work. There is no controversy about the quantitjT of work done, and as the defendants have received the benefit thereof, the claimants are entitled to be paid the contract rates therefor, which are represented in the allowance of $33,743.72 as the average cost of the work.
A like question arises on the facts set forth in finding xvii, where the claimants under the original contract built a three-ring arch of brick and masonry lining in the tunnel, amounting to 11,058.62 cubic yards, which was measured bjr the engineer at 10,650.50 cubic yards.
In making the measurements the engineer allowed onty 123-inches,, for the thickness of the arch instead of 13-& inches, as actual^ constructed. For this work the claimants were allowed for 408 cubic yards at $4.75 per cubic yard, amounting to $1,938, when they should have been allowed for 408.12 cubic yards at the rate specified in the original contract of $14 per cubic yard, or $5,713.68, from which latter sum there should be deducted the $1,938 heretofore allowed, leaving due the claimants the sum of $3,775.68.
Furthermore, in order to put in that thickness of brick masonry, it became necessary for the claimants to make an *315 additional excavation of the tunnel of a similar number of cubic yards, which at the contract rate of $8 per cubic yard therefor, amounted to $3,264. As the defendants have received the benefit of the work, and the rates therefor are as provided in the contract, the claimants are entitled to recover on this finding the two sums last stated.
The other work set forth in the findings appears to have been necessaiy under the original or supplemental contracts under which the work ivas done, or was required to be done by the engineer in charge, for which the contract rates for similar work in connection with the tunnel are charged; and so, -whether the work performed comes strictly within the terms of the contract or is additional work of like character required by the contract, the measure of damages therefor, whether under the contract proper or on quantum meruit, is the rates fixed in the contract; and as the defendants have received the benefit thereof, they are in no condition to complain.
The money retained from the payments due to claimants from time to time were, in accordance with the terms of the contract, withheld until the final completion and acceptance of the work, and as that has now been done, and the defendants are to be recouped for the expenses incurred bjr them in the completion of the defective work, the claimants are entitled on the whole case, after deducting the amount of the counterclaim, to recover judgment for the sum of one hundred and thirty thousand seven hundred and thirty-six dollars and eighteen cents-($130,736.18), which is accordingly ordered.
Weight and Howry,' JJ., did not sit in this case and took no part in the decision.